### COUNTY OF BUCKS, Petitioner,

v.

### PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 8, 1996.

Decided Nov. 1, 1996.

---

Jeremiah J. Cardamone, for Petitioner.

Susan D. Colwell, Assistant Counsel, for Respondent.

Joseph W. Pizzo, for Intervenor, Township of Bristol.

Before PELLEGRINI and KELLEY, JJ., and RODGERS, Senior Judge.

PELLEGRINI, Judge.

The County of Bucks (County) petitions for review of the decision of the Pennsylvania Public Utility Commission (PUC) directing it to bear 75 percent of the costs of closing a pedestrian bridge, periodically inspecting it, and maintaining it. The remaining 25 percent of these costs were allocated to the Township of Bristol (Township).

In July of 1985, the National Railroad Passenger Corporation (Amtrak) filed a petition with the PUC requesting the abolition of the crossing where the Central Avenue pedestrian bridge crosses over Amtrak's tracks within the Township and County. The bridge is between Central Avenue, which runs parallel to at-grade railroad tracks owned and used solely by Amtrak, to a four-lane state highway, Bristol Pike. There is no commuter rail station at this location and the bridge is accessed by stairways on both ends. In 1917, the Public Service Commission ordered that an at-grade highway crossing at the site should be abolished. In the same order, the Public Service Commission required the Pennsylvania Railroad Company, Amtrak's predecessor, before abolishing the highway crossing, to construct and maintain the above-grade pedestrian bridge at the same location. (Reproduced Record 82a).

At the time of Amtrak's petition, the Township and Amtrak agreed that the walkway had become a hangout for local youths so that it was a hazard to those people on the bridge and the passengers travelling beneath it. In 1986, the PUC ordered Amtrak, at its initial cost, to remove the stairway to the bridge and barricade it to pedestrians. The PUC also determined that a hearing was necessary to decide the allocation of the costs and expenses for the closing and removal of the structure.

After a hearing in 1994 before an Administrative Law Judge (ALJ), three parties, Amtrak, the PUC's legal division and the Commonwealth of Pennsylvania, Department of

Transportation (PennDOT) submitted a joint stipulation recommending that the costs already incurred by Amtrak for closing the bridge (totaling $27,545), as well as all future costs, be borne by the Township, the County, or entities other than those signing the stipulation. At the same time, Amtrak requested a permanent closure of the bridge rather than an abolishment of the crossing because abolishment would require restructuring its catenary system. In response, the Township and the County filed briefs in opposition to the stipulation.

■ The ALJ held that Amtrak, even though it owns the bridge, is federally exempted from paying the allocated costs of closing a crossing, citing 49 U.S.C. § 24301(*l*),[1] which grants Amtrak an exemption from "a tax or fee imposed by a State". Because the ALJ determined that the Township and the County were interested parties and because "presumably the County is comprised of a larger taxpayer base and therefore is more easily able to bear the additional expense", the ALJ allocated 75 percent of all costs to the County and the remaining 25 percent to the Township.[2] The PUC adopted the findings and conclusions of the ALJ and rejected the exceptions filed by the County and the Township. The County then filed this appeal and the Township intervened.[3]

■ The County, as well as the Township, first contends that the PUC does not have jurisdiction to close or allocate the costs of closing the bridge because it is a pedestrian-only bridge. The PUC's authority is set

---

1. A limited statutory exemption for Amtrak, set forth in 49 U.S.C. § 24301(*l*)(1), provides as follows:

> Amtrak or a rail carrier subsidiary of Amtrak is exempt from a *tax or fee imposed by a State*, a political subdivision of a State, or a local taxing authority and levied on it after September 1, 1981 . . . .

(Emphasis added). The subsequent provision provides jurisdiction in the federal district courts for actions brought by Amtrak to enforce the exemption, but does not preclude this court's jurisdiction over Amtrak. This section was formerly codified at 45 U.S.C. § 546b, which was repealed by § 7(b) of the Act of July 5, 1994, Pub.L. 103–272, 108 Stat. 1379; it was reenacted with linguistic but not substantive change and recodified at 49 U.S.C. § 24301(*l*) by § 1(e) of

the same Act, 108 Stat. 904. *See* H.R.Rep. No. 180, 103d Cong., 2d Sess. 1, 3, 5 (1993), U.S.Code Cong. & Admin.News 1994, pp. 818, 820, 822.

2. In doing so, the ALJ acknowledged "[t]he township is absolutely correct ... that, 'Except for Amtrak, there is no reason for the bridge to remain'."

3. Our scope of review is limited to determining whether the PUC violated constitutional rights, committed an error of law, rendered a decision that is not supported by substantial evidence, or has violated its rules of practice. *Greene Township Board of Supervisors v. Pennsylvania Public Utility Commission*, 668 A.2d 615 (Pa.Cmwlth. 1995).

forth in the Public Utility Code (Code), as follows:

> The [PUC] is hereby vested with exclusive power to appropriate property for any such crossing, ... and to determine and prescribe, by regulation or order, the points at which, and the manner in which, such crossing may be constructed, altered, relocated, suspended or abolished, and the manner and conditions in or under which such crossing shall be maintained, operated and protected to effectuate the prevention of accidents and the promotion of the safety of the public.

Section 2702(b) of the Code, 66 Pa.C.S. § 2702(b).[4]

 Section 2702(b) of the Code gives the PUC exclusive power to determine the manner in which "such crossings" are maintained, suspended or abolished. The term "such crossings", which limits the PUC's authority, relates back to the crossings described in the first portion of subsection (a). *Delaware, Lackawanna & Western Railroad Co. v. Shuman*, 382 Pa. 452, 115 A.2d 161 (1955).[5] Section 2702(a) of the Code provides, in pertinent part:

> *General Rule.*—No public utility, engaged in the transportation of passengers or property, shall, without prior order of the commission, construct its facilities across the facilities of any other such public utility or across any highway at grade or above or below grade, or at the same or different levels; and no highway, without like order, shall be so constructed across the facilities of any such public utility ...

A crossing has been defined as an intersection of two or more public utilities. *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission*, 140 Pa.Cmwlth. 270, 592 A.2d 797, 800 n. 2 (1991), *petition for allowance of appeal denied*, 531 Pa. 642, 611 A.2d 714 (1992). A railroad-highway crossing is the intersection of a highway with a railroad's right-of-way upon which railroad tracks lie and can be at, above or below the grade of the railroad tracks. *Id.* 592 A.2d at 800 n. 3. A "highway" is defined in Section 102 of the Code as "[a] way or place of whatever nature open to the use of the public as a matter of right *for purposes of vehicular traffic.*" (Emphasis added).

 Although admitting that the bridge was not designed to carry vehicles, the PUC argues that it should have jurisdiction because it would provide pedestrians the same protection and promotion of safety given those people using vehicles, citing *Consolidated Rail Corporation v. Pennsylvania Public Utility Commission*, 76 Pa.Cmwlth. 25, 463 A.2d 90 (1983).[6] In that case, we interpreted the definition of "highway" in Section 102 to include a proposed bikeway that would also be open to pedestrians but not to motor vehicles. Holding that the bikeway-railroad crossing was within the PUC's jurisdiction, we stated, "[i]t is plain that numbers of bicycles and other non-motorized means of conveyance in motion constitute vehicular traffic." *Id.* 463 A.2d at 92. Although bicycle travel is considered vehicular traffic, a bridge constructed solely for pedestrian use is not a highway as defined by the

---

4. Additionally, the PUC is expressly granted the jurisdiction to allocate costs, as follows:

 [T]he cost of construction, relocation, alteration, protection, or abolition of such crossing, and of facilities at or adjacent to such crossing which are used in any kind of public utility service, shall be borne and paid, as provided by this section, by the public utilities or municipal corporations concerned, or by the Commonwealth, in such proper proportions as the [PUC] may, after due notice and hearing, determine, unless such proportions are mutually agreed upon and paid by the interested parties. Section 2704(a) of the Code, 66 Pa.C.S. § 2704(a).

5. Interpreting the relevant section of the Public Utility Code of 1937, the Supreme Court stated:

 The Legislature undoubtedly has the power to give to the Public Utility Commission exclusive jurisdiction of all crossings over a railroad right-of-way, but in Section 409 of the Code [Section 2702 of the Code] the jurisdiction of the Commission was carefully limited to *public or highway* crossings.

 *Id.*, at 457, 115 A.2d at 164 (emphasis in original).

6. The PUC also argues that a highway is involved in this case, Central Avenue, the road that runs parallel to the railroad tracks. This argument ignores the direct language of the Code requiring a *crossing* of the highway and railroad.

**682**

Code because no "vehicular traffic" was intended or permitted.[7] Because the PUC's authority to allocate the costs in a highway-rail crossing must be found within the Code, *Pittsburgh Railways Co. v. Pennsylvania Public Utility Commission*, 427 Pa. 562, 237 A.2d 602 (1967), and no such authority exists, the PUC is without jurisdiction to order the closing of the pedestrian bridge or allocate the costs.

 At oral argument, the PUC also contended that it should have jurisdiction over the bridge because its predecessor, the Public Service Commission, ordered it to be built. The issue of the Public Service Commission's jurisdiction was apparently not raised when it ordered the abolishment of the highway crossing and the construction of the pedestrian bridge. The Public Service Commission's enabling statute, the Act of July 26, 1913, P.L. 1374,[8] while limiting its jurisdiction to highway-railroad crossings, did not define the term "highway". *See* Article 1, section 1 and Article V, section 12. Jurisdiction may have been assumed by the Public Service Commission because it determined that the pedestrian bridge could be required as a condition of the abolishment of the highway crossing. Once the highway bridge was abolished, as ordered by the Public Service Commission, there was no basis for the PUC's assertion of jurisdiction based on any purported jurisdiction of the Public Service Commission. Even if the Public Service Commission had been given jurisdiction over pedestrian bridges by the 1913 law, it is within the powers of the General Assembly to narrow or redefine the PUC's jurisdiction as it sees fit.

In conclusion, the PUC, as an administrative agency created by statute, has only those powers expressly conferred upon it by statute or those powers which are necessarily implied from its express powers. *Feingold v. Bell of Pennsylvania*, 477 Pa. 1, 383 A.2d 791 (1977); *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 664 A.2d 664 (Pa.Cmwlth.1995). The plain language of the present Code limits the PUC's jurisdiction to highways for vehicular traffic which excludes the pedestrian bridge at issue here without regard to any prior assertion of jurisdiction. Accordingly, we reverse the PUC's order allocating the costs of closing and maintaining the bridge[9] and we need not reach the remaining issues raised by the parties.

### ORDER

AND NOW, this 1st day of November, 1996, the order of the Pennsylvania Public Utility Commission, entered November 9, 1995, No. A–00106412, is reversed.

**7.** Our decision has no effect on the PUC's regulation of pedestrian portions of highway crossings because where the PUC has jurisdiction, it is exclusive. *See* Section 2702(b) of the Code, 66 Pa.C.S. § 2702(b); *Shuman.*

**8.** Repealed by the Public Utility Law of 1937, Act of May 28, 1937, P.L. 1053.

**9.** In *City of Philadelphia v. Pennsylvania Public Utility Commission*, 676 A.2d 1298 (Pa.Cmwlth. 1996), (petition for allowance of appeal filed June 21, 1996), we discussed the responsibility for roads and bridges that would occur if the PUC did not exist. At common law, the owner of

a bridge has the duty to maintain it to enable the public to use it safely. If a bridge is unsafe and should be closed or removed, that, too, is the duty of the owner and an affected municipality may enforce the duty in court or undertake the cost and file an action to recover the costs. Elliott, The Law of Roads and Streets, §§ 41, 785 (2d ed.1900). *See also Southeastern Pennsylvania Transportation Authority, supra*, 592 A.2d at 804 (the PUC does not impose a new responsibility on the owners and parties benefiting from a crossing, but, in essence, only requires the parties to perform the same maintenance responsibilities that they would normally incur).